UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| DOYLE THORNTON TENO, III, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 3:18-CV-159 |
| v. | ) | |
| | ) | Judge Collier |
| MYRON IWANSKI, STEVE MEAD, | ) | Magistrate Judge Guyton |
| LESLIE MEAD, and STEVE EMERT, | ) | |
| | ) | |
| *Defendants.* | ) | |

# **M E M O R A N D U M**

Before the Court is a motion by Defendants Steven Mead and Leslie Mead (the "Meads") for the imposition of sanctions under Rule 11 of the Federal Rules of Civil Procedure against Plaintiff, Doyle Thornton Teno, III, Plaintiff's counsel, Hugh B. Ward and Mindy L. Nower, and Plaintiff's counsel's law firm, Young Williams & Ward, PC. (Doc. 99.) The Meads seek an award of $11,613, representing the attorney fees they incurred in this matter beginning on January 31, 2019. (*Id.* at 1.) Plaintiff responded in opposition (Doc. 104), and the Meads replied (Doc. 107).

Also before the Court is a motion by the Meads to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure to allow the imposition of the sanctions they seek. (Doc. 97.) Plaintiff responded in opposition (Doc. 105), and the Meads replied (Doc. 106).

For the reasons which follow, the Court will **GRANT** the Meads' motion for sanctions (Doc. 99) and **DENY** their motion to alter or amend the judgment (Doc. 97). Plaintiff, his counsel, and his counsel's law firm will be **ORDERED** to pay a sanction of **$11,613** as a deterrent to the Meads allocated as follows: $2,000 by Plaintiff; $4,806.50 by Plaintiff's counsel's law firm; $3,204.50 by Plaintiff's lead counsel; and $1,602 by Plaintiff's secondary counsel.

## I.    <u>BACKGROUND</u>

This dispute arises out of the 2018 mayoral primary campaign in Anderson County, Tennessee.  Defendant Steve Emert ran an unsuccessful campaign against the incumbent mayor, Terry Frank, who is not a party to this action.  The other three Defendants each supported Emert's candidacy: Myron Iwanski, the Trustee of Anderson County and the Chairman of the Anderson County Finance Committee; Steven Mead ("Steve Mead"), a member of the Anderson County Board of Commissioners; and Leslie Mead, Steve Mead's spouse.  Plaintiff was the Delinquent Tax Attorney and Deputy Trustee for Anderson County.  He either was politically affiliated with the incumbent mayor or was identified by Defendants as being so affiliated.

For years, Steve Mead had been creating a document titled "Things You Need to Know About Mayor Terry Frank" (the "Campaign Document").  (Doc. 67-2 at 8–9 [Steve Mead. Dep. at 18–19]; Doc. 68 at 2 [Steve Mead 1st Aff. ¶ 7].)  The version of the Campaign Document at issue in this lawsuit is eleven pages long and contains fifty-three numbered paragraphs criticizing Mayor Frank and her administration.  (Doc. 68-1.)  Criticisms covered such subjects as county finances, personnel matters, cybersecurity, litigation and other legal matters, Mayor Frank's interpersonal style, and allegedly false statements about Steve Mead by Mayor Frank.  (*Id.*)

On November 21, 2017, Steve Mead sent an email to Iwanski, stating "I would love to see the numbers showing how much our Delinquent Tax Atorny [sic] is getting in total pay and how much would have come to the County General Fund if Jay would have been appointed instead." (Doc. 72-7 at 19.)  Iwanski responded with a lengthy email on December 8, 2017, including statements that Plaintiff "is paid a salary of $35,000 with full time employee benefits in the Trustee's office," and Plaintiff "has earned $76,800 in compensation from the 'title search' fees."

(*Id.* at 18–19.) Iwanski and Steve Mead may also have had oral communications regarding Plaintiff and his compensation. (*See* Doc. 72-21 at 12–13 [Iwanski Dep. at 48–49].)

In or around February 2018, Iwanski received copies of Plaintiff's Internal Revenue Service ("IRS") Forms 1099 for 2016 and 2017 from the Anderson County Clerk and Master, Harold P. Cousins, whose office had prepared the forms. (Doc. 72-21 at 11–12 [Iwanski Dep. at 43–46]; Doc. 72-2 at 1–2 [Cousins Aff. ¶¶ 4, 5, 7].) No one else asked for or received a copy of Plaintiff's 1099s from Cousins's office. (Doc. 72-2 at 2 [Cousins Aff. ¶ 9].) Iwanski also asked for and received information about what was on Plaintiff's IRS Forms W-2, but he did not see or receive copies of those forms.[1] (Doc. 72-21 at 11 [Iwanski Dep. at 42–43].) Iwanski denies that Steve Mead ever asked to see Plaintiff's 1099s or W-2s. (Doc. 72-21 at 12–13 [Iwanski Dep. at 48–49].) Steve Mead also denies ever having seen those forms. (Doc. 67-2 at 17 [Steve Mead. Dep. at 41].)

On April 5, 2018, the Meads distributed the Campaign Document at a campaign event. According to their deposition testimony, each of the Meads distributed one or two copies of the Campaign Document at the event. (Doc. 67-1 at 5–6 [Leslie Mead Dep. at 10–11]; Doc. 67-2 at 9, 11 [Steve Mead Dep. at 19, 33].) Richard Burroughs, who reported directly to Mayor Frank, picked up eight or nine copies of the Campaign Document at the event. (Doc. 67-2 at 23–24. [Steve Mead Dep. at 60–61].) Steve Mead distributed one other copy of the Campaign Document after the event to Lou Jones, his own campaign treasurer. (Doc. 67-2 at 12–13 [Steve Mead Dep. at 35–36].)

---

[1] Plaintiff testified in his deposition that someone told him that Iwanski had asked for and received a copy of Plaintiff's Form W-2 for an unspecified year. (Doc. 72-20 at 4–5 [Pl. Dep. at 13–15, 17].) This portion of Plaintiff's deposition testimony is inadmissible hearsay. Fed. R. Evid. 801, 802.

3

As of its distribution on April 5, 2018, Paragraph 25 of the Campaign Document discussed Plaintiff's compensation, his IRS Form 1099, and his IRS Form W-2, as follows:

> New Delinquent Tax attorney [Plaintiff Teno] has used a full-time county job with county benefits and other full-time county employees to do this work that he gets paid for independently by the Clerk and Master. *(see 1099s to Doyle Teno)* Before Myron Iwanski was appointed Trustee, Mr. Teno was the highest paid county worker by the hour. Unfortunately, no one really knew how many hours he worked since he mostly worked at home and had the Trustee's staff do his work and mailings. ***1099 for last year was $120,000 (from Clerk and Master) & also got W-2 for about $40-50,000*** and received full county benefits. And now he is demanding 10% commission on collected late taxes instead of the commission-approved 1%. He also refuses to turn over any of the Title Reviews he has charged for… and wants them automatically assessed and charged before they are ever done to everyone paying late taxes.

(Doc. 68-1 ¶ 25 (emphasis added; errors in original).)

The Meads testified at their depositions that they themselves never saw Plaintiff's tax documents, that the reported income numbers in the Campaign Document did not come from Plaintiff's tax documents, and that Plaintiff's tax documents were not attached to the Campaign Document. (Doc. 67-1 at 7 [Leslie Mead Dep. at 16]; Doc. 67-2 at 14–17 [Steve Mead. Dep. at 38–41].) Steve Mead explained during his deposition that he used the terms "1099" and "W-2" in the Campaign Document not because he got information from those documents, but rather to describe the types of income he was discussing, because he has a background in financial services and he was accustomed to using those terms as a descriptor of income types. (Doc. 67-2 at 14–15, 17–18 [Steve Mead Dep. at 38–39, 41–42].)

Plaintiff filed this action on April 23, 2018 (Doc. 1), just over a week before the May 1, 2018, primary election. Plaintiff's original complaint asserted a cause of action against Defendants for inspecting and disclosing Plaintiff's confidential tax information in violation of 26 U.S.C. §§ 6103 and 7431. (*Id.* ¶¶ 29–32.) In his Second Amended Complaint, Plaintiff added a cause of action for invasion of privacy and unreasonable intrusion into private affairs under Tennessee

4

common law, based on the same underlying factual allegations. (Doc. 27 ¶¶ 36–42.) Plaintiff alleged the Campaign Document implied that his Forms 1099 and W-2 were attached to and distributed with the Campaign Document. (*Id.* ¶ 25.) Plaintiff further alleged the Meads were "acting as agents of Defendant Iwanski" when they "obtained, inspected, disclosed and used Plaintiff's confidential Tax Return and Return Information," including his W-2 and 1099. (*Id.* ¶ 31.)

The Meads filed a motion to dismiss arguing, among other things, that they were not persons against whom suit could be brought under 26 U.S.C. §§ 6103 and 7431. (Doc. 29.) The Meads also filed a motion for summary judgment reiterating this argument and asserting discovery had revealed no evidence to support Plaintiff's action against them. (Doc. 65.) Plaintiff responded in opposition to the Meads' motion for summary judgment on January 31, 2019. (Doc. 72.) It is from this date that the Meads start their request for attorney fees as a sanction under Rule 11.

On February 6, 2019, after receiving Plaintiff's response to their motion for summary judgment, the Meads' counsel served Plaintiff's counsel with copies of a draft motion and brief for sanctions under Rule 11.[2] (Doc. 100 [Quist Decl.] ¶ 4; Doc. 100-1.) The Meads' counsel asked that Plaintiff dismiss his claims against them, arguing the response to the motion for summary judgment showed the action had no basis. (Doc. 100-1.) Specifically, the Meads asserted Plaintiff's response gave no proof the Meads were acting as Iwanski's agents or ever saw Plaintiff's tax forms. (*Id.*) The Meads also asserted Plaintiff's compensation was public information, the publication of which could not support the state-law cause of action in Count

---

[2] The Meads' counsel had previously asked Plaintiff's counsel to explain how the federal statute could apply to the Meads or dismiss them from the lawsuit on May 14, May 15, May 30, June 7, and December 21, 2018. (Doc. 100 [Quist Decl.] ¶ 5(a), (b), (d), (e), (f).)

5

Two.  (*Id.*)  Plaintiff did not dismiss his action against the Meads, either within twenty-one days of February 6, 2019, or thereafter.

On March 29, 2019, the Court granted the Meads' and the other Defendants' motions to dismiss and entered judgment in favor of all Defendants.  (Doc. 93.)  The Court dismissed Plaintiff's federal tax-information-disclosure claims with prejudice, finding Defendants were not persons who could be sued under the statute.  (Doc. 92 at 7–13.)  The Court dismissed Plaintiff's state-law claims without prejudice because it declined to exercise supplemental jurisdiction over them.  (Doc. 92 at 13–14.)

On April 22, 2019, the Meads filed a motion for Rule 11 sanctions (Doc. 99) and to reopen the judgment to allow the imposition of such sanctions (Doc. 97).  Plaintiff responded in opposition to each motion (Docs. 104, 105), and the Meads replied (Docs. 106, 107).

## II.    <u>STANDARD OF REVIEW</u>

Rule 11 of the Federal Rules of Civil Procedure imposes a legal duty on attorneys to certify any papers filed with the court are legally tenable. Fed. R. Civ. P. 11.  It provides in part as follows:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

The decision to award Rule 11 sanctions is within the discretion of the district court. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 419 (6th Cir. 1992); *see also* Fed. R. Civ. P. 11 Advisory Committee Notes (1993) ("Advisory Notes").  When deciding whether to impose Rule 11 sanctions, a court should consider "whether an individual's conduct was reasonable under the circumstances." *Union Planters Bank v. L & J Dev. Co*., 115 F.3d 378, 384 (6th Cir. 1997) (citing *Lemaster v. United States*, 891 F.2d 115, 118 (6th Cir. 1989)).  This is to be viewed from an objective standpoint: "A judge should not use hindsight to determine the reasonableness of an attorney's acts, but should use an objective standard of what a reasonable attorney would have done at that time." *In re Triple S Restaurants, Inc*., 519 F.3d 575, 579 (6th Cir. 2008) (citing *In re Big Rapids Mall Assocs.*, 98 F.3d 926, 930 (6th Cir. 1996)).  Consistently with this objective standard, a party or attorney's good-faith belief in the merits of a case is not enough to avoid sanctions. *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003).

Rule 11 itself does not delineate the factors a court should consider when deciding whether to impose sanctions.  However, the Advisory Notes list several factors a court can consider, which include:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11 Advisory Notes.

If, "after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A sanction under Rule 11

> must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4). The Rule "de-emphasizes monetary sanctions and discourages direct payouts to the opposing party." *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009) (citing Advisory Notes). The "rule recognizes, however, that 'under unusual circumstances . . . deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation.'" *Id.* (quoting Advisory Notes).

## III.  <u>DISCUSSION</u>

Plaintiff raises three arguments in opposition to the Meads' motion for sanctions. First, Plaintiff argues the motion is untimely, in that it was filed after the Court entered judgment in the Meads' favor. Second, Plaintiff argues he did not violate Rule 11. Third, Plaintiff argues that even if he did violate Rule 11, the payment of attorney fees to the Meads is not an appropriate sanction. The Court will address each argument.

### A.      Timeliness of Motion for Sanctions

Before a party may file a motion for Rule 11 sanctions, he or she must serve the opposing party with a copy of the proposed motion. Fed. R. Civ. P. 11(c)(2). If the opposing party

8

withdraws or corrects the challenged paper, claim, defense, contention, allegation, or denial within twenty-one days from service of the proposed motion, the motion is not to be filed with the court. *Id.* This provision creates a "safe harbor" in which a party may correct problems before becoming subject to potential sanctions.

Plaintiff argues the Meads' motion for sanctions is untimely because it was filed after the entry of final judgement. (Doc. 104.) Plaintiff relies on the Advisory Notes, which state that "a party cannot delay serving its Rule 11 motion until conclusion of the case." (*Id.* at 1 (quoting Advisory Notes).) Plaintiff further relies on several cases in which the Court of Appeals for the Sixth Circuit has denied a Rule 11 motion that was filed after a case was closed. (*Id.* at 1–2.) The Meads, on the other hand, argue the motion is timely because it was served on Plaintiff more than twenty-one days before the entry of final judgment, and it was not filed until more than twenty-one days after that service. (Doc. 107.)

The language of the Advisory Notes on which Plaintiff relies distinguishes between the service that starts the safe-harbor period and the filing that brings the motion before a court. It is serving a motion after judgment, not filing it after judgment, that the Note proscribes: "a party cannot delay *serving* its Rule 11 motion until conclusion of the case." Advisory Notes (emphasis added). This distinction is clear in the statement's context:

> The [1993] revision [of Rule 11] leaves for resolution on a case-by-case basis, considering the particular circumstances involved, the question as to when a motion for violation ***should be served*** and when, ***if filed***, it should be decided. Ordinarily the motion should be ***served*** promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely. In other circumstances, it should not be ***served*** until the other party has had a reasonable opportunity for discovery. ***Given the "safe harbor provisions"*** discussed below, a party cannot delay ***serving*** its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).

Advisory Notes (emphasis added).  It makes sense that a party cannot wait until a case is over to start the twenty-one-day safe-harbor period by serving a proposed motion, because after a case is closed, it is impossible for the receiving party to correct or withdraw the offending contention.  *See Ridder v. City of Springfield*, 109 F.3d 288, 295 (6th Cir. 1997) (because a Rule 11 motion cannot be made unless there is something that can be withdrawn, "a party cannot wait to seek sanctions until after the contention has been judicially disposed").  If a party's correction of its alleged fault is impossible, the safe-harbor period cannot run.  The Advisory Notes simply do not address post-judgment filing of a motion for sanctions that has previously been properly served under the safe-harbor provision.

Plaintiff relies on *Ridder* to support his untimeliness argument, pointing to its statement that the moving party had "given up the opportunity to receive an award of Rule 11 sanctions in this case by waiting to file the motion until after the entry of summary judgment."  *Ridder*, 109 F.3d at 297.  On its face, this statement supports Plaintiff's position.  In *Ridder*, however, the defendant never complied with the safe-harbor provision at all, because it did not serve its motion on the plaintiff before filing it with the court.  *Id.* at 296.  Filing with the court and the first service of the motion on the plaintiff did not take place until after the court had granted summary judgment in the defendant's favor.  *Id.* at 291–92.  The reasoning of *Ridder* thus focuses exclusively on the defendant's failure to comply with the safe-harbor provision by serving the motion a copy of the proposed motion before judgment.  *Id.* at 296.

*Ridder*'s holding, however, is broader than its reasoning.  It extends beyond the failure to serve the motion before judgment to the failure to file the motion before judgment:

> [W]e . . . hold that [defendant] has given up the opportunity to receive an award of Rule 11 sanctions in this case by waiting to file the motion until after the entry of summary judgment. . . .  In sum, adhering to the rule's explicit language and overall structure, we hold that sanctions under Rule 11 are unavailable unless the motion

10

for sanctions is served on the opposing party for the full twenty-one day "safe harbor" period before it is filed with or presented to the court; his service and filing must occur prior to final judgment or judicial rejection of the offending contention.

*Id.* at 297. As recognized by the Court of Appeals in a subsequent case, *Ridder's* inclusion of a pre-judgment filing requirement is unnecessary to the disposition of the case, making it nonbinding dicta. *Powell v. Squire, Sanders & Dempsey*, 182 F.3d 918 (Table), 1999 WL 519186, at *3 (6th Cir. July 16, 1999). Where the safe-harbor period is started at least twenty-one days before final judgment, a motion filed after judgment may be timely. *Baker v. Bank One, Lexington, N.A.*, 156 F.3d 1228 (Table), 1998 WL 466437, at *2 (6th Cir. July 30, 1998), *disagreed with on other grounds by Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 768 (6th Cir. 2014).

Plaintiff also relies on *Moore v. LaFayette Life Insurance Company*, 458 F.3d 416 (6th Cir. 2006). Similarly to the situation in *Ridder*, there is no indication in *Moore* that the party seeking sanctions served its motion on the opposing party before filing it. *See id.* at 427 (reciting filing of motion after entry of judgment and filing of appeal). And while the timeliness discussion in *Moore* is brief, its implication is that there was no pre-filing service of the motion, because the principles it invokes are those requiring pre-filing service:

> Under the revised Rule 11, sanctions under Rule 11 are only appropriate **when a party is made aware of the offending document as filed with the court and has an opportunity to withdraw the filing**. Fed. R. Civ. P. 11 advisory comm. notes (1993 amendments) ("[A] party cannot delay **serving** its Rule 11 motion until conclusion of the case . . .") This court held as much in *Ridder*, 209 F.3d at 295 ("A party must now **serve** a Rule 11 motion on the allegedly offending party **at least twenty-one days prior to the conclusion of the case** or judicial rejection of the offending contention."). The parties do not dispute that the Rule 11 motions were made after the disposition of the case on summary judgment. Therefore any sanction under Rule 11 constitutes an abuse of discretion.

*Id.* at 446 (emphasis added). Thus, neither *Ridder* nor *Moore* requires this Court to impose a rule that a motion under Rule 11 must not only comply with the safe-harbor provision, but must also be filed before the entry of judgment.

11

In this case, the Meads served a copy of their motion for sanctions on Plaintiff fifty-one days before the Court entered judgment and seventy-five days before filing the motion. (*See* Docs. 93, 99, 100 ¶ 4, 100-1.) Plaintiff had the full benefit of the twenty-one-day safe harbor, and chose not to withdraw the challenged claims. The protective purpose of the safe-harbor provision was fulfilled in this case. The Meads' failure to file their Rule 11 motion until after the entry of judgment does not make their motion untimely.

## B.    Sanctionable Conduct Under Rule 11

According to the Meads, "Plaintiff and his counsel had an obligation under Rule 11 to stop pursuing a frivolous lawsuit once, beyond any objective or subjective criteria, it was known to them that their case was frivolous." (Doc. 102 at 1.) The Meads argue this happened no later than January 31, 2019, when Plaintiff responded to their motion for summary judgment.[3] (*Id.*)

The Meads make arguments that implicate three subsections of Rule 11(b), arguing Plaintiff made unsupported factual contentions, Rule 11(b)(3), took unwarranted legal positions, Rule 11(b)(2), and acted with an improper purpose, Rule 11(b)(1).[4] Before considering those

---

[3] Because the Meads' motion seeks sanctions beginning only as of the filing of Plaintiff's response to the motion for summary judgment, the Court does not consider whether a violation of Rule 11 occurred before that filing. *See Indah v. U.S. Secs. Exch. Comm'n*, 661 F.3d 914, 927 (6th Cir. 2011) (a court may not find a violation of Rule 11 in conduct that goes beyond the specific conduct identified in motion for sanctions).

[4] Plaintiff objects to the Meads' failure to identify the subsections of Rule 11(b) Plaintiff is alleged to have violated. (Doc. 104 at 2–3.) The Meads quoted the four subsections of Rule 11(b) in their entirety (Doc. 102 at 2), and included sections in their memo labeled "The Second Amended Complaint Analyzed Under Existing Law" (*id.* § III), "Factual Contentions" (*id.* § IV), and "Improper Purpose" (*id.* § V). It appears self-evident to the Court that the Meads' arguments regarding a political vendetta fall under subsection (b)(1) (improper purpose), their arguments that certain of Plaintiff's legal positions were frivolous fall under subsection (b)(2) (legal contentions warranted by existing law or nonfrivolous argument for extending, modifying, or reversing), and their arguments that facts were not supported fall under subsection (b)(3) (factual contentions have evidentiary support).

12

arguments, the Court will review the causes of action Plaintiff asserted to provide context for its Rule 11 analysis.

### 1.  Plaintiff's Causes of Action

Plaintiff asserted two causes of action against the Meads: violation of the federal tax-disclosure statute, 26 U.S.C. §§ 6103 and 7431, and invasion of privacy under Tennessee common law.

### a.  Violation of the Tax-Disclosure Statute

In Count One, Plaintiff asserted a cause of action for inspecting and disclosing his confidential tax information in violation of 26 U.S.C. §§ 6103 and 7431. (Doc. 27 ¶ 36–39.)

Section 6103 of the Internal Revenue Code provides that "[r]eturns and return information shall be confidential." 26 U.S.C. § 6103(a). A "return" is defined as

> any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

*Id.* § 6103(b)(1) (emphasis added). "Return information" is defined to include

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense[.]

*Id.* § 6103(b)(2)(A).

This confidentiality obligation applies to three categories of persons: (1) officers or employees of the United States, *id.* § 6103(a)(1); (2) officers or employees of states or of certain local agencies who receive access to returns or return information under specified subsections of

13

Section 6103, *id.* § 6103(a)(2); and (3) other persons, or their officers or employees, who have access to returns or return information under certain other specified subsections, *id.* § 6103(a)(3). The subsections incorporated into 26 U.S.C. § 6103(a)(3) deal with such persons or subjects as a taxpayer's consent to release information to a designee, *id.* § 6103(c), shareholders of corporations, *id.* § 6103(3)(1)(D)(3), prison officials, *id.* § 6103(k)(10), whistleblowers, *id.* § 6103(k)(13), cybersecurity, *id.* § 6103(k)(14), child-support agencies, *id.* § 6103(l)(13), and persons "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration," *id.* § 6103(n). The Court of Appeals for the Seventh Circuit characterized these three categories as, respectively, "employees of the IRS, state employees to whom the IRS makes authorized disclosures, and private persons who obtain return information from the IRS with strings attached." *See Hrubec v. Nat'l R.R. Passenger Corp.*, 49 F.3d 1269, 1270 (7th Cir. 1995) (discussing earlier version of statute).

One of the basic policy objectives of Section 6103 is to "assure[] taxpayers that the returns and information which they supply to the [federal] government in connection with the assessment and payment of taxes will not become public knowledge." *Crown Cork & Seal Co. v. Penn. Human Relations Comm'n*, 463 F. Supp. 120, 122–23 (E.D. Penn. 1979). The confidentiality obligation, when it arises, extends to any return or return information the person "obtained . . . in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." 26 U.S.C. § 6103(a).

Section 7431 of the Internal Revenue Code allows a taxpayer to bring a civil action for damages if the taxpayer's return or return information has been subject to knowing or negligent

inspection or disclosure in violation of Section 6103. 26 U.S.C. § 7431(a). But a defendant who is not in one of the three categories in Section 6103(a) cannot violate Section 6103, and there can be no claim against him or her under Section 7431. *Dietl v. Mirage Resorts, Inc.*, 180 F. Supp. 2d 1150, 1153 (D. Nev. 2002); *see also Hrubec*, 49 F.3d at 1270 (defendants must come within the categories set out in Section 6103 for plaintiff to have a cause of action under Section 7431).

### b.    Invasion of Privacy

In Count Two, Plaintiff asserted a cause of action for invasion of privacy through an unreasonable intrusion into his private affairs. (Doc. 27 ¶¶ 40–42.) Tennessee courts recognize the common-law tort of invasion of privacy when it occurs through an unreasonable intrusion into the private affairs of another. *Givens v. Mullikin ex. Rel. Estate of McElwaney*, 75 S.W.3d 383, 411 (Tenn. 2002), *superseded on other grounds by statute*, Tenn. Code Ann. § 29-26-121(f), *as recognized in Williford v. Klepper*, 597 S.W.3d 454, 462 (Tenn. 2020). "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Id.* (quoting *Roberts v. Essex Microtel Assocs., II, L.P.*, 46 S.W.3d 205, 211 (Tenn. Ct. App. 2001)).

While it is not necessary to show that the defendant publicized the plaintiff's private information, a plaintiff must show "an intentional, and objectively offensive, interference with his or her interest in solitude of seclusion." *Id.* at 411–12 (citing *Restatement (Second) of Torts* § 652B cmt. a (1977)). Further, "there is no liability for the examination of a public record concerning the plaintiff." *Id.* (quoting *Restatement (Second) of Torts* § 652B cmt. c (1977)).

The tort has been described as having three elements: "(1) an intentional intrusion, physical or otherwise; (2) upon the plaintiff's solitude or seclusion or private affairs or concerns; (3) which would be highly offensive to a reasonable person." *Burnette v. Porter*, No. W2010-01287-COA-

15

R3-CV, 2011 WL 4529612, at *4 (Tenn. Ct. App. Sept. 30, 2011) (quoting *Restatement (Second) of Torts* § 652B (1977)).

Having set out the legal context of Plaintiff's causes of action, the Court next analyzes Plaintiff's factual contentions under Rule 11(b)(3).

### 2. Plaintiff's Factual Contentions, Rule 11(b)(3)

The presentation of a pleading, motion, or other paper to the Court, either by filing it or by advocating for it after it is filed, is a certification "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . the factual contentions [it contains] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). The Meads argue the following factual contentions violated this certification no later than when Plaintiff responded to the motion for summary judgment.

Plaintiff did not identify any of these factual contentions as needing "a reasonable opportunity for further investigation or discovery" to obtain evidentiary support when he responded to the motion for summary judgment. Therefore, the relevant question as to each factual contention will be whether it actually had evidentiary support. *See id.*

### a. Whether the Meads Were Iwanski's Agents

Plaintiff alleged in the Second Amended Complaint that the Meads were "acting as agents of Defendant Iwanski" when they "obtained, inspected, disclosed and used Plaintiff's confidential Tax Return and Return Information." (Doc. 27 ¶ 31.) In response to the Meads' motion for summary judgment, Plaintiff argued the tax-confidentiality statute applied to the Meads because they were Iwanski's agents. (*See* Doc. 72 [Pl.'s Resp. to Mot. for Summ. J.] at 15–18 (discussing agency and acting-in-concert theories); Doc. 104 [Pl.'s Resp. to Mot. for Sanctions] at 3 (discussing agency argument).) In their motion for sanctions, the Meads argue Plaintiff provided

16

no evidence to support his allegation that the tax-confidentiality statute applied to them (Doc. 102 at 7), and that Plaintiff's assertion that the Meads were agents of Iwanski was sanctionable (*id.* at 4–5).

Plaintiff does not state under what body of law he contends an agency relationship existed between the Meads and Iwanski. For present purposes, the Court will consider

> the classic definition of common-law agency: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) (quoting *Restatement (Third) of Agency* § 1.01 (2006)).

The section of Plaintiff's response to the motion for summary judgment titled "Relevant Testimony and Documentary Evidence in Support of Plaintiff's Response" does not mention agency or point to any facts that could establish a fiduciary relationship between the Meads and Iwanski. (*See* Doc. 72 at 2–7.) The remainder of Plaintiff's response to the motion for summary judgment does not point to any evidence of agency, either, using generalities such as that the Meads "acted in concert with Defendant Iwanski's violation of Section 6103," or that "Defendants were aware of and facilitated a violation of Section 6103." (*Id.* at 15.) Nor does Plaintiff's response to the motion for sanctions attempt to point to any evidence that the Meads had a fiduciary relationship with Iwanski. (*See* Doc. 104 at 3 ("Plaintiff further *theorized* that the Meads were acting as agents for Iwanski and it was through that and Iwanski's liability under the statute that the Meads could be liable." (emphasis added)).)

The Court concludes that Plaintiff had no evidentiary support for his contention that the Meads were Iwanski's agents as of the filing of Plaintiff's response to the motion for summary

17

judgment. Plaintiff's contention that the Meads were Iwanski's agents therefore violated Rule 11(b)(3) at that time.

### b. Whether Plaintiff's Income Was a Matter of Public Record

In Count Two, Plaintiff claimed the Meads made an unreasonable intrusion into his private affairs. (Doc. 27 ¶¶ 41–42.) In their motion for sanctions, the Meads argue Plaintiff made the unsupported factual contention "that Plaintiff's compensation as Assistant Anderson County Trustee and Delinquent Tax attorney were [sic] not public record." (Doc. 102 at 8.) The Meads point to a lack of evidence that Plaintiff's compensation amount was private and to the fact that Plaintiff was later willing to stipulate that his compensation was public record. (*Id.*) Plaintiff's response does not specifically address whether his compensation amount was public or private information. (*See* Doc. 104.) Instead, in defending the cause of action he brought in Count Two, Plaintiff focuses on the private nature of his tax forms. (*See, e.g.*, *id.* at 4.)

Plaintiff's Second Amended Complaint did not expressly assert that the amount of his compensation from Anderson County was private information. (*See* Doc. 27.) Nor did his response to the motion for summary judgment make this assertion. (*See* Doc. 72.)

Some of Plaintiff's arguments could be read to imply that he claimed his compensation amounts were private. For example, in responding to the Meads' motion for summary judgment, he stated that "Defendants argue that Plaintiff's invasion of privacy claim cannot be sustained because ***Plaintiff's salary is not private***, not highly offensive to a reasonable person, and of legitimate public concern and Plaintiff states no damages. Defendant's [sic] argument is ***misplaced and contrary to the evidence***." (Doc. 72 at 18 (emphasis added).) Plaintiff followed that statement, however, only with a discussion of the elements of the tort of unreasonable intrusion. (*Id.* at 18–19.) Likewise, in his response to the motion for sanctions, Plaintiff asserts

18

that "[h]is personal and private information was accessed by unauthorized people and publicized in political pamphlets in a political race." (Doc. 104 at 5.)

Such arguments would be consistent with the position that Plaintiff's compensation was private information. They would also, however, be consistent with the position Plaintiff did expressly assert, that his tax forms were the private information into which the Meads intruded. (*See, e.g.*, Doc. 72 at 10 (responding to Defendants' argument that Plaintiff's compensation was public by arguing that the Campaign Document "explicitly refers to Plaintiff's IRS Forms W-2 and 1099, not his general salary information.")

If Plaintiff had contended that his income from Anderson County was private, the Court would be constrained to find that the assertion had no evidentiary support and violated Rule (11)(b)(3). However, given the lack of an express assertion by Plaintiff that his compensation from Anderson County was private information, as well as his emphasis on his tax forms as the private information at issue in the lawsuit, the Court concludes Plaintiff did not contend that his compensation from Anderson County was private information. Plaintiff cannot have violated Rule 11(b)(3) as to a contention he did not make.

### c. Whether the Meads Saw or Distributed Plaintiff's Tax Forms

As discussed in the preceding section, the private information at the heart of Plaintiff's lawsuit was not the amount of compensation Plaintiff received from Anderson County, but rather his tax forms themselves—copies of his Forms 1099 and W-2. *See supra* § III(B)(2)(b). Both of Plaintiff's causes of action against the Meads thus involved the factual question of whether the Meads had seen or distributed any of Plaintiff's tax forms. Count One, under the tax-confidentiality statute, could only have succeeded if the Meads had inspected Plaintiff's tax forms or distributed them to third parties. *See* 26 U.S.C. § 7431(a). Count Two, under Tennessee

common law, could likewise only have succeeded if the Meads had seen or distributed Plaintiff's tax forms. *See Givens*, 75 S.W.3d at 411–12.

The Meads argue that, as of the time Plaintiff responded to their motion for summary judgment, there was no evidence they had ever seen or distributed copies of his tax forms. (Doc. 102 at 8.) The Meads testified in their depositions that they never saw Plaintiff's tax forms and that Plaintiff's tax forms were not attached to the Campaign Document when they distributed it. (Doc. 67-1 at 7 [Leslie Mead Dep. at 16]; Doc. 67-2 at 14–15, 17 [Steve Mead Dep. at 38–39, 41].)

Plaintiff responds that he did provide evidence that the Meads saw and distributed his tax forms: the Campaign Document itself. (Doc. 104 at 4.) That document, which Steve Mead wrote and which both of the Meads distributed, stated "(see 1099s to Doyle Teno)," and "1099 for last year was $120,000 (from Clerk and Master) & also got W-2 for about $40–50,000." (*See* Doc. 72 at 5 (quoting Campaign Doc. ¶ 25).) Plaintiff argues that Steve Mead testified that the Campaign Document was "truthful and accurate," and he therefore must have seen the forms, because the Campaign Document cannot have been truthful and accurate "if it cite[d] to a source which he [Steve Mead] ha[d] not seen." (Doc. 104 at 4 (without citation to Steve Mead's testimony).) As to distribution, Plaintiff argues that "[t]he document specifically states '(see 1099s to Doyle Teno),' as though Plaintiff's 1099s were an attachment to the document or available upon request." (*Id.*) Plaintiff further argues that it is permissible for a plaintiff to prove his or her case through circumstantial evidence. (*Id.*)

The Court must decide whether Plaintiff's contentions that the Meads saw and distributed his tax documents had evidentiary support as of the filing of his response to the motion for summary judgment. *See* Rule 11(b)(3). "[I]f a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient

20

'evidentiary support' for purposes of Rule 11." Fed. R. Civ. P. 11 Advisory Notes. Because the Meads seek sanctions as of the filing of Plaintiff's response to the motion for summary judgment, the Court will first consider whether Plaintiff could have defeated summary judgment by showing a genuine issue of material fact as to whether the Meads saw or distributed his tax forms.

In considering a motion for summary judgment, a court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, it is to view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001). Nevertheless, a plaintiff's factual contentions at the summary-judgment stage require more than a scintilla of evidence. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). There must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252). Thus,

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (quoting *Matsushita*, 475 U.S. at 586–87).

### i.      Distribution of Plaintiff's Tax Forms

The Court considers Plaintiff's distribution contention first. The statement "(see 1099s to Doyle Teno)" in the Campaign Document is not a direct assertion that any of Plaintiff's 1099s were attached to the Campaign Document. It could, however, give rise to an inference that some number of Plaintiff's 1099s were attached to, and therefore distributed with, the Campaign Document. Plaintiff implicitly acknowledges that this is only an inference, rather than direct evidence. (*See* Doc. 72 at 5 (Campaign Document "is stated to *suggest* that multiple versions of

21

Plaintiff's IRS Form 1099 were attached") (emphasis added); *see also id.* at 9–10 (Campaign Document "explicitly references details of Plaintiff's IRS Form W-2 and IRS Form 1099, and *implies* that these items were attached for distribution") (emphasis added).) In fact, Plaintiff also acknowledges that the "see 1099s" language could instead give rise to an inference that Plaintiff's 1099s instead of being attached, would have been available for review upon request. (Doc. 104 at 4 "[t]he document specifically states '(see 1099s to Doyle Teno),' as though Plaintiff's 1099s were an attachment to the document *or available upon request*") (emphasis added).)

There is no other evidence that Plaintiff's tax forms were attached to the Campaign Document. The Campaign Document's second reference to Plaintiff's tax forms, "1099 for last year was $120,000 (from Clerk and Master) & also got W-2 for about $40–50,000," neither states nor implies that any of Plaintiff's 1099s or W-2s were attached.

Nor has Plaintiff submitted testimony from any of the people to whom the Meads gave the Campaign Document to the effect that Plaintiff's tax forms were attached to the Campaign Document. To be sure, the Meads testified during their depositions that they did not know the names of most of the people to whom they had given the Campaign Document. (Doc. 67-1 at 5–6 [Leslie Mead Dep. at 10–11]; Doc. 67-2 at 9, 12 [Steve Mead Dep. at 19, 35].) This was so despite Plaintiff's counsel asking the Meads about specific names in connection with giving out the Campaign Document at the campaign event. (*See id.*) But Steve Mead did identify Jones and Burroughs as having received the document, one at the campaign event, and one after it. (Doc. 67-2 at 13, 23–24 [Steve Mead Dep. at 36, 60–61].) And Plaintiff did not present testimony from either of them that the Campaign Document had attachments.

Plaintiff has also not submitted direct evidence that the Meads received copies of Plaintiff's tax forms, which would have been a necessary prerequisite to their distributing them. Instead,

22

there is evidence that Iwanski and Steve Mead had written and oral discussions about Plaintiff's compensation amounts, none of which evidence any transfer to (or viewing of) the forms by Steve Mead.[5]

Because the inference from the "see 1099s" language does not extend to Plaintiff's Forms W-2, and because there is no other evidence that the tax forms were attached, there is no evidence that any of Plaintiff's W-2s were attached to or distributed with the Campaign Document. Plaintiff's contention that the Meads distributed his tax forms is therefore without evidentiary support so far as Plaintiff's W-2s are concerned. The Court turns next to Plaintiff's 1099s.

It would have been impossible for this record as a whole to have led a rational trier of fact to find that the Meads had distributed Plaintiff's 1099s. Plaintiff therefore could not have avoided summary judgment by arguing there was a genuine issue of fact as to distribution of his 1099s.[6]

---

[5] Iwanski, for example, testified that Steve Mead sent him "a request for information, a comparison of how much it was costing to use [Plaintiff], and I sent him information. We may have talked briefly as a follow up . . . ." (Doc. 72-21 at 12–13 [Iwanski Dep. at 48–49].) An email exchange between Steve Mead and Iwanski is also in the record, in which Steve Mead said "I would love to see the numbers showing how much our Delinquent Tax Atorny [sic] is getting in total pay and how much would have come to the County General Fund if Jay would have been appointed instead," and Iwanski replied with a lengthy email, including statements that Plaintiff "is paid a salary of $35,000 with full time employee benefits in the Trustee's office," and Plaintiff "has earned $76,800 in compensation from the 'title search' fees." (Doc. 72-7 at 18–19.) Steve Mead, similarly, testified that he got information for the Campaign Document from various sources, including public documents and information from Iwanski. (Doc. 72-22 at 5–6, 10–11 [Steve Mead Dep. at 20–21, 39–41].) Plaintiff's compensation, as discussed above, was public information.

[6] Even Plaintiff's opposition to the motion to dismiss implicitly acknowledged that he would need more evidence than the mere ambiguous inference from the Campaign Document to sustain his case once he got beyond the motion-to-dismiss stage. In response to the motion to dismiss, Plaintiff stated as follows: "The plain language of the [Campaign] Document states that either the IRS Forms were attached to it or could be referenced by requesting the materials from Defendants. ***Discovery is necessary for Plaintiff to make a determination on that matter, but either is sufficient at this stage***." (Doc. 45 at 10 (emphasis added).) Once discovery was complete and Plaintiff had to respond to the summary judgment motion, however, he continued to rest only on the inference from the Campaign Document, rather than reconsidering his claim.

23

*See Scott*, 550 U.S. at 380.  An inference must be reasonable for a Court to consider it in assessing whether there is a genuine issue of material fact as to a motion for summary judgment.  *See Matsushita Elec.*, 475 U.S. at 587.  To infer that Plaintiff's 1099s were attached to the Campaign Document based only on the statement "(see 1099s to Doyle Teno)" would have been unreasonable.  The inference itself, as Plaintiff has acknowledged (*see* Doc. 104 at 4), was ambiguous.  And Plaintiff produced no evidence that there was an attachment from any other source, even though he knew the names of at least two people who had received the Campaign Document from one of the Meads.  On the record as a whole, this unreasonable inference leaves nothing more than a "metaphysical doubt" that copies of Plaintiff's 1099s were distributed with the Campaign Document.  *See Scott*, 550 U.S. at 380.

Put another way, Plaintiff's factual contentions required more than a scintilla of evidence to survive the Meads' motion for summary judgment.  *See Hartsel*, 87 F.3d at 799.  A "scintilla" of evidence is "[a] spark or trace" of evidence.  *Scintilla*, *Black's Law Dictionary* (11th ed. 2019).  If a single inference, which Plaintiff himself identifies as being capable of an alternative construction, and which is contradicted by all of the other relevant evidence in the case, is not a scintilla, it is hard to picture what is.

Having concluded that Plaintiff's contention that the Meads distributed his 1099s would have failed at the summary-judgment stage, the Court turns to the next question: did Plaintiff's inference that Plaintiff's Form 1099s were attached to the Campaign Document qualify as "evidentiary support" under Rule 11(b)(3) for the contention that the Meads distributed his 1099s?  *See* Fed. R. Civ. P. 11 Advisory Notes ("That summary judgment is rendered against a party does not necessarily mean, for purposes of th[e] certification, that [a party] had no evidentiary support

for its position.")  To answer this question, the Court must consider whether Plaintiff's "conduct

was reasonable under the circumstances."  *See Union Planters Bank*, 115 F.3d at 384.

One of Plaintiff's summary-judgment exhibits was a demand letter dated April 12, 2018,

from Hugh B. Ward, Esq., to the Meads (the "April 2018 Letter").[7]  (*See* Doc. 72-12 [Pl.'s Ex.

13].)  Although Mr. Ward is one of Plaintiff's attorneys, he wrote the April 2018 Letter not in that

capacity, but as counsel for Burroughs, the person Steve Mead identified as having taken multiple

copies of the Campaign Document at the campaign event.

The April 2018 Letter stated as follows:

> Our firm represents Richard Burroughs.
>
> It is our understanding that you both possessed and claimed ownership of **the enclosed document** on public display with campaign materials on behalf of County mayoral candidate Steve Emert at the Oak Ridge Civic Center this past April 5th.  Our client has asked us to advise him regarding the appropriate legal remedies to determine liability and seek monetary damages against those responsible for its defamatory passages, unlawful disclosures, and publication.
>
> To complete our review please forward to the undersigned [certain information about the document] . . . .  Of course, at this stage, we cannot compel you to forward the requested information.  Once, however, **possible legal action** is commenced discovery, subpoena authority and depositions will afford an opportunity to seek this material under the authority of the Court.

---

[7] The parties did not make arguments about the April 2018 Letter in the motion for sanctions.  The Court came across the April 2018 Letter (Doc. 72-12) while trying to locate Exhibit 12 to Plaintiff's response to the motion for summary judgment in connection with a different factual contention by Plaintiff, because the exhibit stickers on Plaintiff's exhibits to his response to the motion for summary judgment do not match the exhibit numbers in ECF.  (*See infra* § III(B)(2)(d), discussing Pl.'s Ex. 12, found at Doc. 72-11.)

Notice and an opportunity to respond regarding conduct that allegedly violates Rule 11 is an important part of the scheme set out by Rule 11.  *Indah*, 661 F.3d at 928.  A court therefore cannot sanction conduct under Rule 11 other than the conduct identified in the motion for sanctions or a court's own show-cause order.  *Id.* at 927.  The Court considers the April 2018 Letter not as potentially sanctionable conduct itself, but for what it shows about the circumstances in which Plaintiff was operating when he opposed the Meads' motion for summary judgment.

25

(Doc. 72-12 at 1 (emphasis added).)  The remainder of Plaintiff's Exhibit 13 consists of the eleven-page Campaign Document.  (*Id.* at 2–12.)  There are no attachments to the Campaign Document in Exhibit 13, nor is there any indication in the letter itself that any attachments have been omitted.

The April 2018 Letter shows two facts that are relevant to the present analysis.  First, it shows that within a week of the campaign event, Plaintiff's counsel was in possession of at least one copy of the Campaign Document that had come from the Meads at the campaign event.  That Plaintiff's counsel sent a demand letter to the Meads about the Campaign Document without referring to or including any attached tax documents tends to show that the copy of the Campaign Document Plaintiff's counsel received had no such attachments.

Second, the April 2018 Letter shows that, also within a week of the campaign event, Plaintiff's counsel was in communication with Burroughs, who had gotten multiple copies of the Campaign Document at the campaign event.  Burroughs was antagonistic enough to the Meads to be willing to have a demand letter threatening possible litigation sent on his behalf.  However, by the time Plaintiff had to respond to the Meads' motion for summary judgment, he had never submitted evidence from Burroughs as to whether Plaintiff's tax forms were attached to the Campaign Document.  It strains credulity to think that if Burroughs could have truthfully testified that he received copies of Plaintiff's tax forms with the Campaign Document, Plaintiff would have omitted all reference to such evidence from his case entirely.

The April 2018 Letter thus tends to show both that the copies of the Campaign Document the Meads distributed at the campaign event did not include Plaintiff's tax forms, and that Plaintiff's counsel knew this before Plaintiff's lawsuit was ever filed.  Before discovery, it might have been reasonable for Plaintiff's counsel to seek discovery on whether copies of Plaintiff's tax forms were distributed with other versions of the Campaign Document or at other times.  Once

discovery was concluded, however, and given the lack of any evidence from Burroughs, continuing to insist that Plaintiff's tax forms were distributed with the Campaign Document was not reasonable under the circumstances.

The Court has already concluded that Plaintiff's contention about the Meads' distributing his W-2's was without evidentiary support. Considering the weakness and unreasonable nature of the inference about Plaintiff's 1099s from the Campaign Document's language, the direct evidence that they were not attached, the lack of other evidence that they were attached, and the implications of the April 2018 Letter, the Court concludes that Plaintiff's contention that the Meads distributed his 1099s was also without evidentiary support, no later than the filing of Plaintiff's response to the motion for summary judgment. Plaintiff's entire contention about distribution, as to both of the Meads, therefore violated Rule 11(b)(3) as of that time.

### ii.    Seeing Plaintiff's Tax Forms

The Court turns next to Plaintiff's contention that the Meads saw his tax documents. As with distribution, Plaintiff relies only on the language of the Campaign Document to support this contention: "(see 1099s to Doyle Teno)," and "1099 for last year was $120,000 (from Clerk and Master) & also got W-2 for about $40–50,000." (*See* Doc. 72 at 5 (quoting Campaign Doc. ¶ 25).) Also as with distribution, the Campaign Document does not contain a direct assertion that either of the Meads had seen Plaintiff's tax documents.

The language of the Campaign Document does not raise an inference that Leslie Mead, who was not an author of the document, had seen Plaintiff's tax forms. Nor can Plaintiff rely on any inference that either of the Meads would have seen Plaintiff's tax forms as attachments to the Campaign Document, because the Court has concluded that there is no evidentiary support for the contention that they were attached. *See supra* § III(B)(2)(c)(i). Therefore, Plaintiff's contention that Leslie Mead saw his tax forms was without evidentiary support and violated Rule 11(b)(3).

27

As to Steve Mead, who wrote the Campaign Document, the citation to Plaintiff's 1099s and recitation of the amount of compensation on his 1099 and W-2 for the previous year could give rise to an inference that he had seen Plaintiff's 1099s and W-2s.[8]

Steve Mead testified during his deposition that he never saw Plaintiff's tax documents. (Doc. 67-2 at 14–17 [Steve Mead. Dep. at 38–41].)  Steve Mead testified that he got information for the Campaign Document from various sources, including public documents reporting Plaintiff's compensation and Iwanski.  (Doc. 72-22 at 5–6, 10–11 [Steve Mead Dep. at 20–21, 39–41].)  Plaintiff's compensation, as discussed above, was public information.  (*See supra* § III(B)(2)(b).)  Iwanski also testified that he communicated with Steve Mead about Plaintiff and Plaintiff's compensation.  (Doc. 72-21 at 12–13 [Iwanski Dep. at 48–49].)  At least one such email exchange between Steve Mead and Iwanski is in the record, and it does not involve any viewing of Plaintiff's tax documents by Steve Mead.  (Doc. 72-7 at 18–19.)

Steve Mead also testified during his deposition that he used the terms "1099" and "W-2" in the Campaign Document not because he got the information from those documents, but rather to describe the types of income he was discussing, because he has a background in financial services and he was accustomed to using those terms as a descriptor of income types.  (Doc. 67-2 at 14–15, 17–18 [Steve Mead. Dep. at 38–39, 41–42].)

---

[8] Plaintiff argues that, beyond just giving rise to an inference, Steve Mead **must** have seen the forms, because otherwise he could not have testified in his deposition that the numbers in the Campaign Document citing those forms was "truthful and accurate."  (Doc. 104 at 4.)  This argument fails to explain why Steve Mead's testimony about the accuracy of the Campaign Document is credible, but his testimony in the same deposition about where he did (and did not) get the information in the Campaign Document is not credible.  It also ignores Steve Mead's testimony about the things he would have changed in the Campaign Document if he could, namely what he described as his use of the terms 1099 and W-2 to, as he described it, identify types of income, rather than actual sources of data.  (*See* Doc. 67-2 at 14–15, 17–18 [Steve Mead Dep. at 38–39, 41–42].)

28

The inference from the Campaign Document that Steve Mead had seen Plaintiff's tax forms is stronger than the inference that the tax forms were attached to the Campaign Document. "([S]ee 1099s)," as Plaintiff conceded, could imply either that Plaintiff's 1099s were attached to the document or that they were available for reference. It could also imply that, if the reader were able to track the 1099s down through some other means, they would support the statements in the Campaign Document. The Court concludes that the inference that Steve Mead had seen Plaintiff's tax forms, by contrast, is reasonable, and at least arguably constituted more than a scintilla of evidence. The Court is unable to say with confidence that a rational trier of fact could never have found for Plaintiff on whether Steve Mead had seen Plaintiff's tax forms on this record. *See Matsushita*, 475 U.S. at 586–87. Because Plaintiff could arguably have shown a genuine issue of material fact as to whether Steve Mead had seen Plaintiff's tax forms at the summary-judgment stage, the Court concludes Plaintiff did not violate Rule 11(b)(3) as to that contention.

As explained above, Plaintiff's contention that Leslie Mead had seen Plaintiff's tax documents violated Rule 11(b)(3) as of the filing of Plaintiff's response to the motion for summary judgment. Plaintiff's contention that Steve Mead had seen Plaintiff's tax documents, by contrast, had some evidentiary support. The contention as to Steve Mead therefore did not violate Rule 11(b)(3) as of the filing of Plaintiff's response to the motion for summary judgment.

### d. Whether Iwanski Gave Steve Mead Details of Plaintiff's Income on March 31, 2018

The Meads argue Plaintiff made the following assertion, in his response to the motion for summary judgment, which was unsupported by or contrary to the record: "On March 31, 2018, after Defendant Iwanski received Plaintiff's 2016 and 2017 IRS Forms 1099, he provided Defendant Mead with specific details of Plaintiff's income information. (Steve Mead Dep. pp. 50–51; Ex. 12)." (Doc. 102 at 7–8.) The Meads argue that "[n]owhere in Steve Mead's deposition,

29

let alone on pages 50–51, does Steve Mead testify that on March 31, 2018, Mr. Iwanski provided him details of Plaintiff's income information." (*Id.* at 8.) Plaintiff does not address this argument in his response to the motion for sanctions. (*See* Doc. 104.)

The Meads are correct that the portion of Steve Mead's deposition Plaintiff cited does not support the contention Plaintiff says it does. However, Plaintiff also cited his own Exhibit 12 to his response to the motion for summary judgment, which included a copy of an email exchange between Iwanski and Steve Mead. (*See* Doc. 72-11 at 6–7.) That email exchange discussed Plaintiff's compensation and the money that Anderson County and its taxpayers might save if someone else were in Plaintiff's position as Delinquent Tax Attorney. (*Id.*) The exhibit shows Steve Mead sent an inquiry to Iwanski on November 21, 2017, Iwanski responded on December 8, 2017, and Steve Mead forwarded the email to himself on March 31, 2018. (*Id.*) Plaintiff thus gave evidentiary support for all but a March 31, 2018, date for the communication.

In his statement of facts, Plaintiff used the erroneous March 31, 2018, date to assert that the communication took place after Iwanski admittedly received copies of Plaintiff's 2016 and 2017 IRS Forms 1099 in February 2018. (Doc. 72 at 3.) Plaintiff did not, however, use the erroneous March 31, 2018 date in his argument section or elsewhere in his response.[9] Given Plaintiff's lack of use of the erroneous date elsewhere, the Court concludes this was a careless citation error by Plaintiff. Therefore, the Court will not consider it as a violation of Rule 11(b)(3).

### 3. Plaintiff's Legal Contentions, Rule 11(b)(2)

Having considered whether Plaintiff's factual contentions violated Rule 11(b)(3), the Court turns next to Plaintiff's legal contentions under Rule 11(b)(2). The presentation of a pleading,

---

[9] Plaintiff referred to the same email elsewhere in his statement of facts to support the contention that Iwanski provided year-to-date income information about Plaintiff to Steve Mead on the correct date of December 8, 2017. (Doc. 72 at 3 (citing Doc. 72-7).)

30

motion, or other paper to the Court, either by filing it or by advocating for it after it is filed, is a certification "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). The Meads argue Plaintiff's claims and legal contentions violated this certification no later than when Plaintiff responded to the motion for summary judgment.

### a. Whether the Meads Were Subject to Suit Under the Tax-Confidentiality Statute

The Meads argue Plaintiff's claim against them in Count One for violation of the federal-tax-confidentiality statute was frivolous. (Doc. 102 at 5.) As support, they argue Plaintiff never explicitly pleaded that the statute applied to them and never identified the subsection of the statute that would apply to them, instead relying only on the frivolous assertion that the Meads were liable under the statute because they were Iwanski's agents.

Plaintiff responds that he did plead that the tax-document statutes applied to the Meads, and he argues that he made a good-faith argument about the statute's applicability to the Meads, albeit one with which this Court disagreed when it granted the Meads' motion to dismiss. (Doc. 104 at 3–4.) Plaintiff argues Rule 11 should not be used "to deter novel legal arguments or cases of first impression." (*Id.* at 3 (quoting *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co. of Fl.*, 827 F.2d 1454, 1458 (11th Cir. 1987).) Plaintiff argues his attempt to apply the statute to the Meads as "other persons" was in good faith, that the situation was not subject to controlling authority, and that he distinguished potentially relevant case law in good faith. (*Id.*) In describing his argument for the applicability of the statute, he restates his theory

that "the Meads were acting as agents for Iwanski and it was through that and Iwanski's liability under the statute that the Meads could be liable." (*Id.*)

Plaintiffs' response to the motion for sanctions thus seeks to justify his statutory cause of action against the Meads on two legal grounds: first, because they could have been "other persons" under the statute; and second, because they could have been agents of Iwanski.

### i. Applicability of the "Other Person" Language

The "other person" language appears in § 6103(a)(3): "no other person (or officer or employee thereof) who has or had access to returns or return information under [certain other subsections of § 6103] . . . shall disclose any return or return information obtained by him in any manner . . . under the provisions of this section. . . ." Plaintiff's argument that "[t]he statute allows 'other persons' to be liable'" is problematic for two reasons. (*See* Doc. 104 at 3.)

First, Plaintiff's response to the motion for sanctions appears to be the first time he has argued that the Meads, of themselves, came within the scope of subsection (a)(3). In the Second Amended Complaint, Plaintiff did not identify a subsection of 26 U.S.C. § 6103 into which the Meads could fit. (Doc. 27 ¶ 38 (citing only § 7431(a)(2), which creates the cause of action).) For Iwanski, by contrast, Plaintiff identified two specific subsections, 6103(a)(2) and 6103(n), as it is incorporated into Section 6103(a)(3). (Doc. 27 ¶ 37.) Nor did Plaintiff argue the Meads on their own came within Section 6103 in response to the Meads' motion to dismiss (*see* Doc. 45 at 5–6 (arguing against the Meads based on agency only), or in response to the motion for summary judgment (*see* Doc. 72 at 15–18 (same)).

Second, the reference to "other person[s]" in subsection (a)(3) is limited to persons who "ha[ve] or had access to returns or return information under" certain other listed subsections of § 6103. 26 U.S.C. § 6103(a)(3). The list of subsections is long, but their content is specific. (*See, e.g.*, *supra* § III(B)(1)(a) (summarizing some of the subsections incorporated into 26 U.S.C.

32

§ 6103(a)(3).) Plaintiff has made no effort, now or in previous filings, to explain how the Meads could fit into any of those categories. Plaintiff's reference to the broad language "other person[s]" therefore cannot help to justify his tax-confidentiality cause of action against the Meads.

### ii. The Agency Argument

Plaintiff's other, and primary, argument for applying the tax-confidentiality statute to the Meads is that the Meads were liable because they were Iwanski's agents. The Court has already concluded that Plaintiff's factual contention that the Meads were Iwanski's agents violated Rule 11(b)(3). (*Supra* § III(B)(2)(a).) The Court also ruled in connection with the Meads' motion to dismiss that Plaintiff's agency argument was not meritorious. (Doc. 92 at 8.) The Court must now consider whether Plaintiff's agency argument was "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *See* Fed. R. Civ. P. 11(b)(2).

"Arguments for extensions, modifications, or reversals of existing law or for creation of new law do not violate subdivision (b)(2) provided they are 'nonfrivolous.'" Fed. R. Civ. P. 11 Advisory Notes. The Court is to take into account "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys" in determining whether a litigant has violated Rule 11(b)(2). *Id.*

The Court concludes that Plaintiff's agency argument was neither "warranted by existing law" nor "by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *See* Fed. R. Civ. P. 11(b)(2). The Court does not reach this conclusion because it rejected Plaintiff's agency argument when it granted the Meads' motion to dismiss. Rather, the Court reaches this conclusion because, as the Court phrased the matter at that time, there was "neither legal support nor logic for extending liability under Section 7431 to persons not

33

included in Section 6103 merely because those persons are alleged to be agents of someone who is." (*See* Doc. 92 at 8.)

Plaintiff's main affirmative argument for extending liability to alleged agents seems to have been that it would advance the statute's purpose of protecting the confidentiality of tax returns. (*See* Doc. 72 at 15, 17; *see also* Doc. 104 at 3 ("The statute allows 'other persons' to be liable. Plaintiff, in good faith, applied the present facts to the stated policy objective of the statute and the three relevant cases that he could find . . . .").) But if enhancing confidentiality were enough to extend liability under the statute, everyone would be liable, and the statute's detailed scheme would be meaningless. This is not a legally sufficient basis to argue for extending liability to non-enumerated persons under the statute.

"Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." Fed. R. Civ. P. 11 Advisory Notes. Plaintiff did not indicate that his position might be seeking a change in the law until he responded to the motions for sanctions. (*Compare* Doc. 72 at 15–18 (not mentioning a change in law) *with* Doc. 104 at 3 ("Rule [11] is intended to deter frivolous suits, not to deter novel legal arguments or cases of first impression.") (alteration in original; citation omitted).) Plaintiff's agency argument is therefore not entitled to the greater tolerance appropriate for an explicit request for a change in the law.

As Plaintiff argues in his response to the motion for sanctions, he did attempt to distinguish three cases in which courts had found no liability under the statute for persons outside the statute, arguing those cases "lack[ed] the necessary 'avenue of the government' requirement to fall under §6103 and §7431." (Doc. 72 at 16–17.) While distinguishing contrary cases may help remove an obstacle to reaching the legal result a party wants, it does not provide an affirmative rationale for

34

extending the reach of a statute. Moreover, Plaintiff's grounds for distinguishing those cases, based on an "'avenue of the government' requirement," was legally unsound. The statute sets out multiple specific scenarios in which a person could be subject to Section 6103, not a vague requirement that there be some involvement of an "avenue of the government." *See* 26 U.S.C. § 6103(a).

Finally, Plaintiff has offered no reasoning or authority to support the extension of liability to agents of persons named in the statute. As the Court previously stated, "[a]gency is . . . a common-law construct under which a principal may be bound by the actions of his or her agents— not the other way around." (Doc. 92 at 7–8, *citing Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998).) What Plaintiff sought was not just a change in law, but one that would upend the long-established principles governing an agency relationship.

The Court concludes that Plaintiff's contention that the Meads would have been subject to suit under Sections 7431 and 6013 of the Internal Revenue Code if they had been the agents of Iwanski was frivolous, unwarranted by existing law, and not supported by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law. It therefore violated Rule 11(b)(2) as of the filing of Plaintiff's response to the motion for summary judgment.

### b. Whether Plaintiff Was Damaged by Disclosure of His Income Amount

The Meads argue Plaintiff's assertion that he was damaged by the Meads' public disclosure of his compensation was frivolous, because Plaintiff's compensation from Anderson County was a matter of public record. (Doc. 102 at 5.) The Court has concluded Plaintiff did not assert that the amount of his compensation, itself, was private information. (*Supra* § III(B)(2)(b).) The Court accordingly concludes that Plaintiff's related legal contention, although not always clearly expressed, was that the disclosure of copies of his tax forms caused him damages. Because

Plaintiff did not clearly contend that he was damaged by the disclosure of his compensation amounts, there can have been no violation of Rule 11(b)(2) as to the contention.

### 4. Plaintiff's Purpose, Rule 11(b)(1)

Having considered Plaintiff's factual and legal contentions under Rule 11(b)(3) and (b)(2), the Court turns next to Plaintiff's purpose under Rule 11(b)(1). The presentation of a pleading, motion, or other paper to the Court, either by filing it or by advocating for it after it is filed, is a certification "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1).

The Meads argue Plaintiff's lawsuit was filed and continued after January 31, 2019, as a way of getting political payback against them. (Doc. 102 at 8–9.) Steve Mead has submitted an affidavit explaining his belief that the lawsuit was, from the beginning and throughout its prosecution, "no more than political posturing and payback and had nothing to do with Mr. Teno allegedly being damaged." (Doc. 101 at 2 [Steve Mead 2d Aff. ¶ 5].) He avers that both Plaintiff and one of his attorneys, Mr. Ward, have a political vendetta or agenda against him. (*Id.* at 3–4 [Steve Mead 2d Aff. ¶¶ 5(a), (b)].)

Steve Mead's affidavit sets out four reasons why he believes Mr. Ward has a vendetta against him. First, in 2016, Mr. Ward ran against him for election as an Anderson County Commissioner, losing by a margin of almost two to one.[10] (*Id.* at 3 [Steve Mead 2d Aff. ¶ 5(a)(i)].)

---

[10] The affidavit states that Steve Mead "understand[s] [Mr. Ward] was embarrassed by" the margin of his loss. (Doc. 101 at 3 [Steve Mead 2d Aff. ¶ 5(a)(i)].) An affidavit must be made on personal knowledge. *See* Fed. R. Evid. 602. The basis of Steve Mead's knowledge on this point is not clear, but it appears to be either hearsay or speculation. The Court will not consider this portion of the affidavit.

36

Second, two years later, Mr. Ward was the treasurer for Steve Mead's unsuccessful opponent in the 2018 election. (*Id.* [Steve Mead 2d Aff. ¶ 5(a)(ii)].) Third, Plaintiff's lawsuit against the Meads, Emert, and Iwanski was filed "just in time to hit the local newspaper" before the mayoral primary in which Mayor Frank defeated the Meads' candidate, Emert. (*Id.* [Steve Mead 2d Aff. ¶ 5(a)(iii)].) Fourth, Steve Mead was responsible for a resolution by the Anderson County Commission barring attorneys who had previously represented clients in suits against the County from later representing the County, and this category included Mr. Ward. (*Id.* [Steve Mead 2d Aff. ¶ 5(a)(iv)].)

As to Plaintiff, Steve Mead states that he (Steve Mead) "has been a very vocal critic of the county outsourcing the delinquent tax attorney work that Mr. Teno is now doing." (*Id.* at 3–4 [Steve Mead 2d Aff. ¶ 5(b)].) Taking that work back into the Anderson County government would, Steve Mead argues, cause a dramatic reduction in Plaintiff's income, from his position as the highest-paid person in the Anderson County government. (*Id.*)

In response, Plaintiff asserts, without citation to authority, that "[t]he presence of politics is not a ground for determining there is an improper purpose." (Doc. 104 at 5.) He characterizes Steve Mead's assertions as "unfounded and absurd." (*Id.*) As to Mr. Ward, Plaintiff asserts "[i]t is appalling that Defense counsel would even suggest that another member of the Bar brought a lawsuit on behalf of a client for his own political vendetta," and it is beneath the dignity of the Court to address the issue. (*Id.*) As to Plaintiff, he argues the Meads' allegation is untrue, that the Meads used Plaintiff as a pawn in their own feud with Mayor Frank, and that Plaintiff has no vendetta in any case "because all of Mr. Mead's attempts at political subterfuge that in anyway [sic] affected Plaintiff were unsuccessful." (*Id.*)

Plaintiff has submitted an affidavit of Mr. Ward. (Doc. 104-1.) It refers to Steve Mead's allegations that Mr. Ward acted out of a vendetta, and then states, "Defendant Steve Mead's statements are bizarre, false, reckless, malicious, and irrelevant." (*Id.* at 2 [Ward Aff. ¶¶ 5, 6].) The affidavit contains no specific denials of any facts alleged in Steve Mead's affidavit. Instead, it says Mr. Moore mentions "Steve Mead's falsities" only "to note their lack of propriety, and the affront to this Court, on the part of [the Meads' counsel] by offering aspersions in the service of a client." (*Id.* [Ward Aff. ¶ 7].) The affidavit does not directly mention the allegations in Steve Mead's affidavit as they relate to Plaintiff. Plaintiff has also not submitted an affidavit of his own in opposition to the Meads' motion for sanctions.

Presenting or advocating a written paper violates Rule 11(b)(1) if it is done "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). The analysis of an improper purpose under Rule 11(b)(1) resembles the analysis of bad faith or an improper purpose under a court's inherent power to sanction a party by shifting fees. *See BDT Prods., Inc. v. Lexmark Intern., Inc.*, 602 F.3d 742, 752 (6th Cir. 2010). Under that standard, pursuing an action that is without merit may be *evidence* of bad faith, but a court "must find *something more* than that a party knowingly pursued a meritless claim or action at any stage of the proceedings." *Id.* at 753 & 752 n.4 (emphasis in original). "Harassing the opposing party, delaying or disrupting litigation, hampering the enforcement of a court order, or making improper use of the courts are all examples of the sorts of conduct that will support a finding of bad faith or improper purpose," but such conduct may not be shown *only* by knowing pursuit of a meritless claim. *Id.* at 754.

Plaintiff argues the Court should not address the Meads' allegations about Plaintiff's and his counsel's alleged motivations, because to do so would be beneath, or an affront to, the Court.

(Doc. 104 at 5; Doc. 104-1 at 2 [Ward Aff. ¶ 7].)  The Federal Rules of Civil Procedure require the Court to resolve any allegations that a paper has been presented for an improper purpose.  *See* Fed. R. Civ. P. 11(b)(1).  The Court therefore does not have the option to reject those allegations on the grounds that they are beneath the Court.

Plaintiff also argues that the presence of politics is not a proper foundation for finding an improper purpose under Rule 11.  (Doc. 104 at 5.)  However, courts have found an improper purpose based on political motivations or personal vendettas.  *See, e.g.*, *Collins v. Daniels*, 916 F.3d 1302, 1320–22 (10th Cir. 2019) (adding parties for political reasons and without legal basis is an improper purpose under Rule 11); *Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994) (filing action without good-faith legal basis to "pursue a personal agenda against [a government entity]" violates Rule 11) (under previous version of Rule 11); *Scott v. Sanders*, 789 F. Supp. 2d 773, 776 (E.D. Ky. 2011) (pursuing "personal vendetta" against persons not involved in a lawsuit by submitting an affidavit attacking them is an improper purpose under Rule 11(b)(1)).

Plaintiff asserts that Steve Meads' allegations are false, unfounded, bizarre, absurd and malicious.  (Doc. 104 at 5; Doc. 104-1 at 2 [Ward Aff. ¶ 6].)  These assertions are not sufficient to defeat Steve Mead's specific allegations.  The Court cannot, based on a blanket denial, conclude that Mr. Ward did not run against Steve Mead unsuccessfully in 2016, that Mr. Ward was not the treasurer for a 2018 candidate who also ran unsuccessfully against Steve Mead, or that Steve Mead was not responsible for a resolution that effectively prevented Mr. Ward from representing Anderson County in cases going forward.  (Doc. 101 at 3 [Steve Mead 2d Aff. ¶ 5(a)(i), (ii), (iv)].)  Moreover, it is undisputed that Plaintiff's lawsuit was filed approximately a week before the 2018 mayoral primary election, as Steve Mead's affidavit states (*see* Doc. 1 (lawsuit filed April 23, 2018); Doc. 72 [Pl.'s Resp. to Mot. Summ. J.] at 5 (primary election was held on May 1, 2018)),

and there is other uncontradicted evidence in the record that the lawsuit received local news coverage a few days before Mayor Frank won the election by a narrow margin, (*see* Doc. 68 at 3 [Steve Mead 1st Aff. ¶¶ 10, 11]). The record also contains evidence to support the assertion in Steve Mead's affidavit that Steve Mead was a vocal critic of Plaintiff's compensation and work as Delinquent Tax Attorney for Anderson County. (*See* Doc. 68-1 [Campaign Document] ¶ 25; Doc. 72-7 at 19 (Steve Mead email to Iwanski asking how much Anderson County and taxpayers could save if someone else were in Plaintiff's role as Delinquent Tax Attorney).)

All of the foregoing are objective facts which Plaintiff and Mr. Ward could have shown were false, if indeed any of them were false. Lacking any evidence to contradict them other than a blanket denial, however, and finding support for some of them elsewhere in the record, the Court credits them. Based on these facts, in addition to the meritless nature of most of Plaintiff's claims and contentions against the Meads, the Court finds that Plaintiff and his counsel brought the lawsuit for the improper purpose of harassing the Meads for their own personal and political reasons, independently of any merits the action may have had.

Steve Mead's affidavit addresses facts that existed as of the filing of the initial complaint. He also averred, however, that these facts continued to influence Plaintiff and his counsel in continuing to prosecute the action. (Doc. 101 at 2 [Steve Mead 2d Aff. ¶ 5].) The Meads' motion seeks sanctions based on Plaintiff's actions as of the filing of the response to the motion for summary judgment. (Doc. 99 at 1.) The Court concludes that Plaintiff's response to the motion for summary judgment and his choice to keep prosecuting his case against the Meads after that time violated Rule 11(b)(1).

### C.     Sanctions

The Court has concluded that Plaintiff violated Rule 11(b) in multiple ways as of January 31, 2019, and until the dismissal of the lawsuit. (*See supra* §§ III(B)(2)(a), (2)(c), (3)(a), 4.)   The

40

questions remaining are, first, whether sanctions are appropriate for those violations; second, the form and amount of any such sanctions; and third, against whom any such sanctions should be assessed.

### 1.    Whether Sanctions Are Appropriate

Factors for a court to consider in deciding whether to impose Rule 11 sanctions include

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11 Advisory Notes.

The Court has found multiple significant violations of Rule 11(b) by Plaintiff.  His factual contention that the Meads were Iwanski's agents violated Rule 11(b)(3).  (*Supra* § III(B)(2)(a).) That factual contention was crucial to Plaintiff's tax-disclosure-statute cause of action against the Meads in Count One.  Plaintiff's legal contention that the Meads were subject to the tax-disclosure statute violated Rule 11(b)(2), which would have been fatal to Count One, even if Plaintiff had provided any factual support for it.  (*Supra* § III(B)(3)(a).)  Plaintiff's factual contention that the Meads distributed Plaintiff's tax forms violated Rule 11(b)(3), as did his factual contention that Leslie Mead had seen his tax forms.  (*Supra* § III(B)(2)(c)(i), (ii).)  Those two findings together were fatal to Plaintiff's cause of action against Leslie Mead in Count Two, for invasion of privacy. They also left Plaintiff's cause of action against Steve Mead in Count Two dependent on a single inference that Steve Mead had seen Plaintiff's tax forms.  And Plaintiff's improper purpose in prosecuting the lawsuit as a whole violated Rule 11(b)(1).  (*Supra* § III(B)(4).)

All of the relevant Advisory Note factors point to the conclusion that sanctions are appropriate. Plaintiff's conduct was willful, rather than negligent. The April 2018 Letter demonstrates that Plaintiff's counsel had good reason to doubt, from the beginning, whether Plaintiff's tax forms were attached to the Campaign Document. Plaintiff also implicitly acknowledged in his response to the motion to dismiss that he would need more evidence of distribution than the Campaign Document to sustain his case once he got beyond that stage. (*See* Doc. 45 at 10 ("Discovery is necessary for Plaintiff to make a determination on that matter . . . .").) Once discovery was complete, however, he continued to rest only on that ambiguous inference from the Campaign Document.

Plaintiff's conduct infected his entire action against the Meads, rather than one particular count or defense. Count One was factually and legally frivolous as to both of the Meads. Despite the Court's dismissal of Count Two without prejudice, and Plaintiff's consequent assertion that Count Two could still be pursued in state court (Doc. 104 at 6), Plaintiff's conduct infected that count, as well. Count Two was factually frivolous as to Leslie Mead, and it hung by the slimmest factual thread as to Steve Mead. Moreover, Plaintiff's entire action against the Meads was infected with the improper purposes of Plaintiff and his counsel.

Plaintiff's conduct was part of a pattern of activity, rather than an isolated event, in that he made multiple unsupported factual allegations and unwarranted legal contentions. Given the Court's finding on an improper purpose, Plaintiff's maintenance of his action against the Meads was intended to injure. Because Plaintiff's conduct infected the entire lawsuit and was continued for an improper purpose, it had a significant effect on the litigation process in time and expense. And, finally, both Plaintiff and his counsel are trained in the law.

Having concluded that sanctions are appropriate, the Court considers the form and amount of sanctions that should be ordered.

### 2. Form and Amount of Sanctions

The Meads seek an award of $11,613, representing the attorney fees they incurred in this matter beginning on January 31, 2019. (Doc. 99 at 1.) They have submitted an affidavit from Steve Mead that these fees totaled $11,613 from January 31, 2019, through the filing of the motion. (Doc. 101 at 2 [Steve Mead 2d Aff. ¶ 3].) They have also submitted a declaration from their counsel setting out the same amount, attaching a description of the services provided since that date, stating that the work and time represented by the descriptions were necessary for the representation, and that the hourly rates of $225 per hour for lead counsel and $140 per hour for the associate attorney were reasonable for the Knoxville area and their respective experience. (Doc. 100 at 4–5 [Brian Quist Decl. ¶¶ 6–9]; Doc. 100-8 [itemized statement of services].) Counsel's declaration also contains an analysis of the criteria for determining a reasonable fee under Rule 1.5(a) of the Tennessee Rules of Professional Conduct. (*Id.* at 5–8 [Quist Decl. ¶ 10].)

Plaintiff does not object to the amount of the sanction the Meads seek or to any part of the Meads' submission regarding the fees they incurred to their attorneys. (*See* Doc. 104 at 6–7.) The Court has reviewed the Meads' counsel's billing statement and finds the work completed to have been necessary and appropriate, and the amount of the fee to have been reasonable.

A sanction under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Factors to be considered include

> the nature of the violation committed, the circumstances in which it was committed, the circumstances (including the financial state) of the individual to be sanctioned, and those sanctioning measures that would suffice to deter that individual from similar violations in the future. The court should also consider the circumstances of the party or parties who may have been adversely affected by the violation.

43

*Orlett*, 954 F.2d at 420 (quoting American Judicature Society, Studies of the Justice System, *Rule 11 in Transition: The Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11*, at 12 (1989)) (discussing sanctions under previous version of Rule 11).

Considering the nature and circumstances of Plaintiff's multiple violations and what would be sufficient to deter Plaintiff in future, as well as Plaintiff's failure to object to the amount of the sanctions based on his or his counsel's financial state, the Court concludes that $11,613, the amount of the sanction the Meads seek, is no greater than necessary to deter repetition of this conduct. The Court further finds this no more than necessary in light of the Meads' financial situation. As presented in Steve Mead's second affidavit, the Meads' attorney fees for the entirety of their defense have been $28,336; the Meads are retired senior citizens with a small amount of additional compensation from Steve Mead's work as a County Commissioner and in financial services; and the Meads had to cancel their long-planned fiftieth anniversary trip to Alaska because they could no longer afford to pay for it.

The Meads ask that the sanction be paid to them. (Doc. 99 at 1.) Plaintiff objects, arguing that "the present matter is not appropriate for a monetary sanction for attorney fees." (Doc. 104 at 6.)

A sanction under Rule 11, "if imposed on motion and warranted for effective deterrence," may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). As explained in the Advisory Notes:

> Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty. However, ***under unusual circumstances, particularly for (b)(1) violations, deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also***

> *directs that some or all of this payment be made to those injured by the violation.* Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party. Any such award to another party, however, should not exceed the expenses and attorneys' fees for the services directly and unavoidably caused by the violation of the certification requirement. If, for example, a wholly unsupportable count were included in a multi-count complaint or counterclaim for the purpose of needlessly increasing the cost of litigation to an impecunious adversary, any award of expenses should be limited to those directly caused by inclusion of the improper count, and not those resulting from the filing of the complaint or answer itself.

Fed. R. Civ. P. 11 Advisory Notes (emphasis added).

The Court concludes that this case presents the kind of unusual circumstances that would make deterrence ineffective unless Plaintiff is required to make a payment to the Meads. The Court has found a violation of Rule 11(b)(1), which the Advisory Notes identify as particularly suitable for this unusual form of sanctions. Moreover, as discussed above, Plaintiff's conduct infected his entire action against the Meads, notwithstanding the fact that one count against one of the Meads had a minimal piece of evidentiary support. (*See supra* § III(C)(1).)

Therefore, the Court will order a payment to the Meads of their reasonable attorney fees beginning on January 31, 2019, in the amount of $11,613, as a deterrent measure. Given the extensive nature of the violations and the fact that they infected the prosecution of the entire action against the Meads from and after January 31, 2019, the Court concludes this to be the amount directly resulting from Plaintiff's violations. *See* Fed. R. Civ. P. 11(c)(4).

The Court next considers whether this payment should be ordered against Plaintiff, his counsel, or Plaintiff's counsel's law firm.

### 3.     Against Whom Sanctions Should Be Ordered

If, "after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm,

or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A sanction under Rule 11

> should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation.

Fed. R. Civ. P. 11 Advisory Notes.

Where there has been a violation of Rule 11 as to legal contentions, sanctions against the attorney making or advocating for the offending legal contentions are appropriate. Because of the violations of Rule 11(b)(2) in this case (*see supra* § III(B)(3)(a)), sanctions will be ordered against Plaintiff's counsel. Sanctions against Plaintiff's counsel are also appropriate given counsel's improper purpose in maintaining the lawsuit. (*See supra* § III(B)(4).) In addition, there is no indication that Plaintiff's violations of Rule 11(b)(3) as to factual contentions were not, at least in part, attributable to Plaintiff's counsel. (*See supra* § III(B)(2)(a), (c)(i), (c)(ii).)

"Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee" when a motion for sanctions is granted. Fed. R. Civ. P. 11(c)(1). The Court sees no exceptional circumstances here, nor has Plaintiff argued for any. The Court will accordingly order sanctions against Plaintiff's counsel's law firm in the same amount as sanctions against Plaintiff's counsel.

As to Plaintiff himself, "[s]anctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law. Monetary responsibility for such violations is more properly placed solely on the party's attorneys." *Id.* Here, the Court has found not just a violation of Rule 11(b)(2), but also violations of Rule 11(b)(3) and 11(b)(1). Plaintiff is

a trained and licensed attorney. Given the Court's findings as to Plaintiff's unsupported factual contentions (*see supra* § III(B)(2)(a), (c)(i), (c)(ii)) and improper purpose for maintaining the lawsuit (*see supra* § III(B)(4)), the Court will order sanctions against Plaintiff's counsel. Because Plaintiff was a represented party in this action and therefore cannot be held responsible for the legal violations, the Court will order a smaller share of the sanction against Plaintiff than against his counsel and his counsel's law firm.

One third of the amount of the $11,613 sanction would be $3,871. The Court will order that Plaintiff, Doyle Thornton Teno, III, pay the Meads approximately half of that amount, $2,000. That leaves $9,613 to be allocated between Plaintiff's counsel and Plaintiff's counsel's law firm. The Court will split the remaining amount equally between Plaintiff's counsel and Plaintiff's counsel's law firm. Plaintiff's counsel's law firm will accordingly be ordered to pay $4,806.50. Plaintiff's lead counsel, Mr. Ward, will be ordered to pay the larger share of the remaining amount, $3,204.50, and Plaintiff's secondary counsel, Ms. Nower, will be ordered to pay the smaller share of the remaining amount, $1,602.

### D.    Motion to Alter or Amend Judgment

The Meads have filed a separate motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure, in order to allow the Court to impose the sanctions they seek under Rule 11. (Doc. 97.)

Plaintiff responded in opposition, arguing the Meads have not provided grounds on which the Judgment Order should be amended. (Doc. 105 at 1.) Plaintiff also argues that the Meads' motion erroneously states that motions under Rule 11 do not have an outside filing deadline; Plaintiff relies on the arguments he made regarding timeliness in response to the Meads' motion for sanctions in this regard. (*Id.* at 2.) Plaintiff also argues that "the Meads are attempting to

evade the 'outside deadline' of Rule 11 motions by amending the very document which concludes the case and prevents them from filing a proper motion for Rule 11 sanctions." (*Id.*)

In reply, the Meads represent that they sought to alter or amend the judgment as a precaution, and so that, if sanctions were ordered against Plaintiff, Plaintiff could appeal that order as part of the amended final judgment. (Doc. 106 at 1.) The Meads further state that they would have no objection to the Court's denying their motion to alter or amend if the Court does not find it to be "a required or useful prerequisite." (*Id.* at 2.)

A court "may grant a timely Rule 59 motion to alter or amend judgment [1] to correct a clear error of law; [2] to account for newly discovered evidence or an intervening change in the controlling law; or [3] to otherwise prevent manifest injustice." *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 330 (6th Cir. 2014) (quoting *Doran v. Comm'r of Soc. Sec.*, 467 F. App'x 446, 448 (6th Cir. 2012)).

The Meads' motion does not suffer from any infirmities related to timeliness. A party may file a motion to alter or amend a judgment "no later than 28 days after entry of the judgment." Fed. R. Civ. P. 59(e). The Meads' motion satisfies that requirement. (*Compare* Doc. 93 *with* Doc. 97.) Nor, contrary to Plaintiff's assertion, are the Meads incorrect that it is permissible to file their motion for sanctions after entry of judgment. (*See supra* § III(A).) This also means that amending the judgment to incorporate an award of sanctions against Plaintiff is not necessary for reasons of timeliness.

Based on the lack of necessity to grant the motion to alter or amend in order to grant the Meads' motion for sanctions, Plaintiff's opposition to the motion to alter or amend, and the Meads' acquiescence in the Court's denying the motion to alter or amend, the Court will **DENY** the motion.

IV.    **CONCLUSION**

The Court will **GRANT** the Meads' motion for sanctions (Doc. 99) and **DENY** the Meads'

motion to alter or amend the judgment (Doc. 97).  A payment of **$11,613** will be ordered to be

paid to the Meads as a sanction: $2,000 by Plaintiff, Doyle Thornton Teno, III; $4,806.50 by

Plaintiff's counsel's law firm, Young Williams & Ward, PC; $3,204.50 by Plaintiff's lead counsel,

Hugh B. Ward; and $1,602 by Plaintiff's secondary counsel, Mindy L. Nower.

**An appropriate order will enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**